Louisa Avakian, by Mariam Boyajian, guardian *ad litem,*

*v.*

Hagop Avakian.

[Decided April 10th, 1905.]

1. The jurisdiction of the court of chancery to annul a marriage for duress is not derived from the divorce statute nor limited by its terms as to residence, &c., but is based on the inherent and general jurisdiction of that court over questions arising out of contract.

2. The court of chancery of New Jersey has jurisdiction to annul on the ground of duress a marriage solemnized in England between a resident of Massachusetts and an Armenian who at the time the marriage was performed was on her way to New Jersey to take up her residence there, where the bill was brought by the latter after having resided a short time in New Jersey, and personal service within the state was had on the defendant.

3. Evidence *held* to show that a marriage contract between an Armenian girl fourteen years of age and another Armenian fifty-five years of age, and devoid of physical or other attractions, solemnized in a strange country, where the girl was without friends or money, was procured through duress of the man practiced on the girl.

4. Subsequent cohabitation does not validate a contract of marriage entered into through duress, where it is submitted to while the duress is still operative, especially in the absence of issue.

On final hearing on bill, answer and proofs.

The complainant, Louisa Avakian, whose maiden name was Hagopian, by her bill, asks a decree of annulment by this court of the ceremony of marriage gone through between her and the defendant, Hagop Avakian, on the 12th of February, 1903, at St. Patrick's chapel, in Westminster, in the city of London, England.

The ground of her claim is fraud and duress practiced and imposed upon her by the defendant.

The defendant appeared and answered, and the cause was

heard upon the evidence of witnesses in open court, when the following facts were developed:

The complainant is a native of the city of Diarbekir, on the Upper Tigris, in Turkish Armenia, where in the month of September, 1902, she was living with her parents, being the youngest of six children. The parents were very poor. According to her evidence, she was born on December 3d, 1888. She seemed to be of pure Caucasian blood and very comely in appearance.

At that time there was living in Diarbekir one Mugerdich Takajian, with his wife and one son. He had previously lived for a short time in the United States, and had living in New Jersey another son about twenty-eight years old. He also had a brother living at Summit, New Jersey.

In the summer of 1902 he conceived the idea of again migrating, with his family, to the United States, and, according to his story, having heard of the complainant, he made the acquaintance of and negotiated with her father with a view of arranging a marriage between complainant and his son in New Jersey. Such negotiations resulted, as he swears, in a bargain between complainant's father and himself that at his own expense he should take the complainant to the United States and there have her married to his son.

The complainant does not appear to have known of this arrangement, but swore that she made the journey with a view of living with her aunt, Mariam Boyajian, a sister of her father, who was married and lived with her husband in Hoboken, New Jersey. She swore that she expected to go to school when she reached Hoboken.

She started with Takajian and his wife and son some time in September, 1902, without one cent of money and a scanty supply of clothing. The party seems to have followed the usual route by caravan across the country to Beirut, thence by ship to Alexandria, thence by steamer to Marseilles, whence in ordinary course they should have proceeded across France, and thence by ship either directly, or indirectly by way of England, to the United States.

Takajian undertook the journey with insufficient means, and, owing to unexpected delays and expenses, found himself sub-

.stantially stranded at Marseilles for want of money, and was, as he swears, obliged to lay over until he could obtain funds from his friends in America.

He did, however, have funds enough to forward his own son at once to America.

While waiting at Marseilles, where there seems to have been a sort of Armenian colony or society, he met one Tatoes Hagopian, who was not, however, related in any way to the complainant, but was a cousin of the defendant, and who had just left the defendant at his home in Boston and was on his way from the United States to Armenia, and also met there a young man named Isadore Avakian, a nephew of the defendant and a relative of Tatoes Hagopian, who was on his way as an emigrant from Armenia to the United States, and who was detained at Marseilles by a slight illness.

Tatoes Hagopian, knowing or assuming that the defendant wished a wife, opened negotiations with Takajian for a bargain by which complainant should be married to the defendant. About that time Takajian received a letter from his brother in New Jersey informing him that Takajian's son living there did not wish to get married. The result was that Tatoes, using the language of defendant's answer, "telegraphed to defendant that if defendant would send $200 to pay the expenses of Isadore and Louisa to Boston the complainant would come there and marry him."

The defendant in his answer states that he refrained from forwarding the money until he had received a letter from Isadore recommending the qualities of the girl and her willingness to marry any good Armenian who would make her a good home.

Defendant thereupon cabled to his relatives in Marseilles $200 of which $120 was retained by Takajian and Tatoes, mainly by Takajian, to pay the expenses of bringing the girl from Diarbekir and keeping her up to date. None of it was given to the complainant. Twelve pounds and no more were given to Isadore, and the complainant was placed in his charge to be taken by him to the United States. He had already a steamship ticket from London or Liverpool to the United States, but was himself quite poor.

Takajian swears that before the arrangement was consummated he explained to the complainant that she was going to Boston to be married to the defendant if she liked him when she got there, but that she was not obliged to marry him unless she did like him. He stated to her that the defendant was established in business, about thirty-five years old and had but one eye and that he wore a glass eye.

He did not, in fact wear one at the hearing, and appeared to be between fifty and sixty years old.

With these preliminaries Isadore and complainant started and reached London and stopped at a cheap boarding-house kept by an English woman for the accommodation of poor Armenians.

There Isadore found, or claimed to find, he had not funds sufficient to transport complainant and himself to the United States, and cabled or wrote to the defendant for more funds.

At Marseilles the persons whose names have been before stated met an emigrant from Armenia to the United States named Hagop Chenkooshlian, who, with his family, were also on their way as emigrants from Armenia to the United States. He seems to have become acquainted with all the circumstances herein previously stated and also with the fact that complainant had an aunt living with her husband in Hoboken and her name and address.

He became interested in the complainant, and the circumstance that she seemed to be dealt with as merchandise, and either in Marseilles or at London, perhaps both, wrote to her aunt in Hoboken, stating the situation and complainant's destination at Boston.

He followed the complainant and Isadore to London and arrived there about a fortnight after their arrival and not more than a day or two before the defendant, who upon the receipt of his nephew's letter, asking for more money, instead of cabling it, himself immediately took ship to England and took the complainant and Isadore to a boarding-house other than the one at which they first stopped.

Chenkooshlian, hearing of these facts and that the defendant was about to marry the complainant, attempted, in a feeble way, being poor, to thwart his intentions.

There is considerable contradiction in the evidence as to the occurrences from that time on to the marriage, which occurred within two or three days, or as soon as defendant could, by cabling to the United States, establish his identity at the marriage license office.

Chenkooshlian swears, and is sustained by others in his evidence, that he was at first denied an interview with the complainant; that she was secluded by defendant and Isadore; that he sought the intervention of the police to rescue her, but without success; that he was finally permitted to see her, but in the presence of defendant and Isadore, and that he then begged of her not to marry defendant; that she replied that it was her "fate;" that she complained of being afraid of defendant and that he had threatened her.

The complainant swears to this seclusion and to threats, continuously made by the defendant, of taking her life if she did not marry him. In short, her testimony tended to show that she was under the complete dominion, moral and physical, of the defendant, and was substantially compelled to marry him.

She swears that she, at all times, said her age was fourteen, and denied that she had ever said it was more, except that when she went before the priest and was asked by the interpreter, who interpreted the ceremony, she stated that it was fourteen, but the interpreter told her that she must say eighteen.

There was evidence that she declared her age to be eighteen years. Chenkooshlian swears that he fixed her age at fourteen years from her general appearance, and so stated it at the police office.

Chenkooshlian also swears that he was invited by defendant to be "best man" and prepared to attend the ceremony, but was kept away by a friend of defendant who called to see him shortly before the hour and detained him until the ceremony.

Against this evidence of actual physical and moral dominion is the evidence of the defendant and his friend one Shadorian, who had lived in this country and knew the defendant in Boston, but happened to be in London at the time of the marriage.

Defendant swears that he told complainant at once that if she

felt that he was too old or she too young to marry him she need not marry him, and that he would proceed to Roumania and procure himself a wife there, and that complainant declared that she was ready and willing to marry him. (But he did not state that he promised her to provide for her passage to the United States in case she declined to marry him.) He states that her clothing was so worn and soiled as to make her unfit for association with decent people; that he supplied her with new clothing.

His friend swore that he, the friend, tried to dissuade complainant from marrying the defendant and offered to provide means for forwarding her to the United States. But it did not appear that the complainant had had any previous acquaintance or means of knowledge of the various persons whose names have been mentioned, or means of knowing and judging how far she could rely upon them. He swears that she married defendant willingly.

The defendant did not explain why he did not forward to London the small amount of money necessary to enable his nephew Isadore to complete the journey of himself and complainant to the United States, and allow complainant to see her aunt before being married to him, and why he incurred the expense of a journey from Boston to London and return. There was nothing to indicate that any communication was had with complainant's parents.

The marriage ceremony being performed the defendant took a second-class passage for himself and wife in the next steamer for Boston, where they arrived about the 1st of March, and was enabled to pass immediately to the house of a friend without detention by the commissioner of immigration.

Complainant's aunt, warned by the letter from Mr. Chenkooshlian, awaited the arrival of the steamer at Boston and appealed to the commissioner of immigration to stop her niece and rescue her from the defendant, whom she asserted to be a kidnaper. The commissioner, learning that the defendant and complainant had landed without coming under his jurisdiction, sent an officer who procured their return to Charlestown, which

is the Castle Garden of Boston, where complainant met her aunt and immediately expressed her desire to leave her husband and go with her.

The commissioner assumed jurisdiction and detained the complainant awaiting further consideration and instruction from Washington. Finally it was determined that complainant should be at liberty to exercise her choice, and she again chose to go with her aunt, and the commissioner's officers forcibly prevented the defendant from hindering her.

She came at once with her aunt to Hoboken. The defendant shortly after followed her and sued out a writ of *habeas corpus* against the aunt, returnable before Vice-Chancellor Pitney. The complainant was produced in court by her aunt, and both in the presence of the defendant and privately to the vice-chancellor declared through an interpreter that she wished to stay with her aunt and would not go with defendant. She was declared by the vice-chancellor to be at liberty to go with which ever she chose, her husband or her aunt, both being present in court. She chose to go and did go with her aunt.

The bill herein was filed on March 30th, 1903, and subpœna issued and was served on the defendant personally on the 1st of April, 1903.

There has been no fruit of the married cohabitation.

At the close of the evidence and argument on the facts the vice-chancellor at once, in an oral opinion, declared that the complainant was under a certain degree of duress, both physical and mental, at the time the ceremony was performed, which continued up to the time that she was relieved by her aunt at Charlestown, Massachusetts, but at the request of the defendant's counsel he reserved two questions—*first,* whether this court had jurisdiction over the subject-matter of the suit; *second,* whether the duress was of such a character as to warrant this court in annulling the marriage.

*Mr. Eusebius W. Arrowsmith,* for the complainant.

*Mr. John I. Weller,* for the defendant.

PITNEY, V. C.

I have now to consider the questions reserved at the hearing, namely:

1. Whether this court has jurisdiction of the subject-matter of the cause, considering that the marriage ceremony was performed in England and the defendant is domiciled in Boston, Massachusetts, and that the complainant, at the time the bill was filed, was residing merely, and had resided for a short time only, with her aunt in Hoboken, New Jersey.

The general jurisdiction of this court over the subject-matter of the suit was thoroughly settled by the court of errors and appeals in the well-known case of *Carris* v. *Carris, 24 N. J. Eq. (9 C. E. Gr.) 516.* That, indeed, was a case of pure fraud, but, in the carefully-considered opinion of Judge Bedle, he expressly includes the case of duress.

At *p. 518,* he uses this language: "And so in case of consent extorted by duress, where there may be a color of marriage, yet lacking the element of consent, which is necessary in every marriage."

The decision, however, has for its ultimate basis the ground that the jurisdiction exercised by the English ecclesiastical courts of annulling marriages on the ground of an inherent vice in the original contract had, in this state, of necessity devolved on the court of chancery, and the English cases hereafter to be cited will show that the English courts have, on several occasions, annulled marriages which had been procured by fraudulent duress.

The case of *Ferlut* v. *Gojon, Hopk. Ch. 478,* cited in *Carris* v. *Carris, supra,* is peculiarly in point in support of the *dictum* of Judge Bedle above quoted. I shall have occasion to refer to this case further on, but mention it now for the purpose of calling particular attention to the learned, exhaustive and instructive argument of Counsellor Sampson, printed at length on *p. 481 et seq.*

It is now well settled that marriage is a civil contract, and so treated by the civil courts.

Its peculiarity, however, as pointed out by Judge Bedle, in

*Carris* v. *Carris,* is that while it is essentially a contract between the husband and wife, there is also a third party to the contract, namely, society at large, represented by the civil authority, in which the parties or either of them may at any time come and reside.

The promise made by each spouse to the other is also made to society, and all of them are continuing promises, and binding wherever the parties or either of them go and reside. The marriage contract, then, cannot be disturbed by judicial power without taking into consideration the rights of the public, or, as we sometimes express it, public policy, as it exists in the place where appeal is made to the judical authorities.

Now, in the present case, the complainant came to New Jersey with her aunt early in March, 1902, and fixed her residence with her. She had no other place to which to go, except to remain with her husband in Boston. Her parents lived and still live in Turkish Armenia. Her husband was duly served with process in this suit and duly appeared thereto by a solicitor of this court and answered the bill of complaint without objection to the jurisdiction of the court. The jurisdiction of this court over the person of the defendant is complete. The disposition and ability of this court to represent and take care of the public is indisputable, and I know of no difference in the public policy of the State of Massachusetts, where the defendant resides, and that of the State of New Jersey, where the complainant resides.

The evidence establishes clearly her intention, when she came here, to make New Jersey her home, and there is not the least room to suppose that she came with the intention merely of bringing this suit. Hence I can see no reason to doubt the jurisdiction in the matter of residence of either of the parties. But the counsel takes the ground that the complainant had no domicile, as distinguished from mere residence, in New Jersey at the time the suit was brought; that her domicile was either with her father, in the city of Diarbekir, in Turkish Armenia, or with her husband, in Boston; and that without domicile of one of the parties the court had no jurisdiction.

In support of that contention he cites the *ex parte* case of *Blumenthal* v. *Tannenholz, 31 N. J. Eq.* (*4 Stew.*) *194,* where Chancellor Runyon refused a decree of nullity under the following circumstances: He says that at the time of the marriage neither of the parties resided in this state, "the defendant does not now reside here, he has not been served with process. The complainant was, when the suit was brought, and still is, a minor. There is no evidence that she has been emancipated, but, on the other hand, the evidence is to the contrary." The suit was *ex parte;* the defendant did not appear.

This statement distinguishes that case from the present.

Here the defendant was placed by her father, who lived, as we have seen, in Turkish Armenia, in the hands of one Takajian, to be escorted, according to the complainant's account, to the home of her aunt, her mother's sister, Mrs. Mariam Boyajian, who lived with her husband in Hoboken, New Jersey, and, according to the account of the escort, she was brought to New Jersey to be married to the escort's son, who also lived in New Jersey. In either case New Jersey was to be her home.

It follows from this that she did, by her father's command, change her domicile to the State of New Jersey, and this is true whether her story, as to the object of her journey, or that of her escort, be accepted as the true one.

Further, in the case before Chancellor Runyon, the jurisdiction of the court over the person of the defendant depended absolutely and solely upon there being a domicile in New Jersey of one of the parties.

Without such domicile there is no such *res* in the state as would give the court jurisdiction to proceed against the defendant in the absence of service within the jurisdiction. *Coddington* v. *Coddington, 20 N. J. Eq.* (*5 C. E. Gr.*) *263.*

I have heretofore had occasion to deal with this question in *Watkinson* v. *Watkinson, 67 N. J. Eq. 142,* and in *Wallace* v. *Wallace, 62 N. J. Eq.* (*17 Dick.*) *509* (at *pp. 514, 519, 520* and *521*). See *Haddock* v. *Haddock, 201 U. S. 562.*

But the same stringency as to domicile is not required in a case which is free from collusion and where the complainant is

actually residing in the state and the defendant is served here and appears. *Pohlman* v. *Pohlman,* 60 *N. J. Eq.* (*15 Dick.*) *28.*

The notion that the domicile of the wife follows that of her husband has little or no practical application to suits between husband and wife, since, if the wife was justified in leaving her husband, she thereby became entitled to adopt a new domicile, and if she was not so justified she will fail in her suit on the merits.

But another important consideration intervenes. The jurisdiction of this court over the subject-matter of this cause is not based upon or derived from the divorce statute. Hence it is not limited by any of the terms of that statute as to residence, &c. It is based on the original inherent and general jurisdiction of this court over questions arising out of contracts *inter partes,* and is exercised over contracts of marriage in which is found some vice inherent in their origin precisely as in cases arising out of ordinary contract.

In ordinary cases of contract the defendant must be served with process within the territorial jurisdiction in order to obtain jurisdiction of his person. This has been done here. He has appeared by a solicitor and answered the bill without taking any exceptions either to the jurisdiction of the subject-matter or of his person. Under these circumstances I am not sure that any residence on the part of complainant is necessary.

I shall add the suggestion that this action is not properly classified as a suit for a divorce which is almost universally based upon some cause of action arising after the marriage and which dissolves a valid marriage. The exception in our statute is the provision for a declaration of nullity based on incapacity, &c.

Further, the complainant's right to relief does not depend upon the question whether the marriage ceremony was void *ab initio* or only voidable.

We may assume in this instance that it was valid by the law of England and was voidable at the option of the complainant.

In so assuming we shall simply range it with ordinary contracts which have been obtained by fraud or duress. The general rule is that such contracts are binding on the wrong-doer and voidable at the option of the injured party.

I have examined all the authorities cited by counsel for defendant and find in them nothing to disturb the conclusion that the court has full jurisdiction of this cause. The most striking of them are cases where the question of jurisdiction based on extra-territorial service was involved.

Of the power of the court to annul a marriage, solemnized in another jurisdiction, there can be no doubt. It was exercised in the eighteenth century by the English ecclesiastical court in *Harford* v. *Morris, 2 Hagg. Cons. 423,* and in *Scrimshire* v. *Scrimshire, 2 Hagg. Cons. 395.*

The next question reserved was, whether the duress, so called, to which the complainant was subjected at the time of the ceremony, was sufficient to justify the annulment of the marriage.

I think it worth while to remark, just here, that while public policy is deeply interested in the permanency and inviolability of the marriage contract, it is equally interested in having it entered into by persons of competent age and judgment, reasonably suited to each other by age, temperament and disposition, and hence it encourages and almost requires that young persons and especially young females at this crisis of their lives should have the aid, assistance and sanction of their parents and guardians, if any, or friends and relatives occupying the position of parents and guardians.

The books abound in cases based on the wrong of abducting a young female and inducing her to enter into a marriage contract without the supervision and sanction of her parents or other persons standing in *loco parentis,* and all well-considered codes of law provide for criminal proceedings in such cases.

They are found in our code in *1 Gen. Stat. p. 1063* §§ *79, 81, 82, 197, 250.* The last-cited section adjudges it a misdemeanor to have carnal intercourse with any woman under the age of sixteen years with or without her consent.

Section 81 provides that if any person shall unlawfully take *any maid,* widow or wife contrary to her will, and shall marry her himself or cause or procure her to be married to another, *either with or without her consent,* he shall be deemed guilty of a high misdemeanor, and every such marriage shall be void.

Section 82 provides that if any person shall unlawfully convey

or take away any *woman-child unmarried,* being *within the age of fifteen years,* out of or from the possession, custody or government and against the will of the father, mother or guardian of such woman-child, *though with her own consent,* with intent to contract matrimony with her, he shall be deemed guilty of a misdemeanor, &c., and if he, without the consent of her father or mother or guardian, contract matrimony with her, he shall be deemed guilty of a misdemeanor, &c.

These sections are the expressions of the well-settled public policy of the state and country on the subject.

Turning, now, to the case in hand, it is further proper to remark that in this class of cases it is necessary to consider carefully each and all of the circumstances preceding and surrounding the ceremony brought into question, including, of course, the age of the complaining party.

Let us look at those circumstances—first, her age. She swears she was born December 3d, 1888, which would make her a trifle over fourteen years of age on the day of the ceremony, February 12th, 1903. A compatriot, Mr. Chenkooshlian, who saw her first at Marseilles, and shortly after in London, just before her marriage, swears that he stated at the police office that she was only fourteen years of age, and that his statement was based entirely upon her appearance. When brought before me on *habeas corpus* the next month, I should have formed the same judgment from her appearance, and at the hearing herein she did not appear more than sixteen years old.

Against this is her admission, sworn to by one or two persons, that she was eighteen years old past, and her statement to the officer where she went with her husband to obtain a license, and also, as I suppose, to the priest who performed the ceremony, that she was eighteen. On this subject she swears that she told the interpreter, who interpreted between her and the officer and priest, that she was fourteen years old, and that he told her that it was necessary that she should say eighteen.

My conclusion from the evidence is that her evidence of her age, as she gives it, is reliable, and that she was born in December, 1888. This matter of age is important, but not conclusive, as we shall see when we come to examine the authorities.

She was placed by her father, in the fall of 1902, in the care of Mr. Takajian, for the purpose, as he swears, of being conducted by him with his family to New Jersey, with the expectation of being there united in marriage with the son of Mr. Takajian, a young man of suitable age, already residing here. Mr. Takajian, on his own statement, had no wider commission from the father than has been just stated.

He had no authority to transfer her custody to any other person, or to assist in marrying her to any other person than his son.

Mr. Takajian thus became her guardian and represented her father, and she presumably so considered it, but evidently she had no proper conception of the limitations upon his guardianship.

Arriving at Marseilles he abandoned his trust and abused his power by handing her over to Isadore Avakian, nephew of defendant, telling her, as he swears, that Avakian would take her to the United States, where she would have the opportunity to marry the defendant, whom he represented to be thirty-five years old and well established in business, but that she was not obliged to marry him if she did not like him when she saw him. She was without money and could speak no language but Armenian, and was compelled by the circumstances to submit to the will of her temporary guardian, and in submission thereto accompanied Isadore to London, still penniless, although she probably knew that the defendant had furnished the money necessary to transport her to the United States. At London she was detained by Isadore until the defendant arrived. She, naturally, felt constrained to do as Isadore, and, after him, the defendant, required her to do. They were, in her mind, placed in the position of guardian of her by the deputation of Mr. Takajian, her first guardian.

It is impossible to imagine a more helpless and desperate condition for a young female. She did, indeed, meet in London other Armenians, to wit, Mr. Chenkooshlian, already mentioned, and a Mr. Shadorian, a friend of the defendant, who lives in or near Boston, and who came on to this state to testify in behalf

of the defendant. They swear that they severally took an interest in her case, and it is manifest that many of the Armenians whom she met in London were shocked at the idea of her marrying the defendant. He stated his age to be thirty-five years, but I understood his Boston friend, who was sworn as a witness, to say he was fifty-five. His face certainly had upon it all the marks that we expect to find upon a man between fifty and sixty years old.

One eye was entirely gone, and altogether he was so very unattractive in appearance that I found it quite impossible to believe that the complainant could have conceived the least, even the most evanescent, liking for him. These two friendly Armenians, whom I have just mentioned, swear that they severally begged of her not to marry the defendant, and one of them that he offered to assist her to the United States. But they were not permitted to see her except in defendant's presence. They were, after all, strangers to her, and it is not surprising that, in her extremely helpless condition, and with her immature judgment, she did not accept the offer, but felt that she must submit to the only person who represented—secondhanded, indeed—the authority and will of her father.

The defendant's conduct in this condition of affairs is to be remarked.

It is fairly inferable from all circumstances, and the defendant's statement in his answer, that he did not cable the money to Marseilles until he had received from his nephew Isadore a full description of the complainant; that either in that letter or the one which he received from Isadore, written at London, he learned that complainant had an aunt living in Hoboken. Now, I can conceive of no reason why he should have incurred the expense of a voyage to London and back instead of cabling to Isadore the few dollars necessary to make up the sum necessary to bring the complainant to Boston, unless he wished to avoid giving the complainant the opportunity to have the benefit of the advice of her aunt before marrying him. It certainly would have been more seemly and decent for him, under all the circumstances, to have done so. After he arrived at London and found, as he says, the complainant unfit, by reason of her cloth-

ing, to associate with decent people, so that he was obliged to furnish her with a new outfit, it would still have been seemly for him to have delayed the marriage until they reached the United States. If, as he swears, she was really willing to marry him and seemingly afraid of losing him for a husband, there was no risk and great propriety in deferring the ceremony until she reached the United States.

He swears that on reaching London he immediately told her, that although he had come from the United States to meet her there and marry her, that he found her too young for him, and that if she did not choose to marry him she need not do so, and in that case, as he was in want of a wife, he would proceed to Roumania and procure one there. But he does not swear or pretend that he offered to relieve her forlorn, destitute and helpless condition by providing for her conveyance thence to her aunt in Hoboken. He swears, as I have said, but I do not believe him, that she immediately declared that she wished to marry him, and that the marriage was at her request and with her full consent. On the contrary she swears, and I believe her, that he told her that she must marry him, and that he threatened her with violence and kept her in a state of almost complete seclusion and practical confinement until the marriage ceremony.

This he took immediate measures to bring about. In order to procure a license he was obliged to communicate by cable with the United States, and in this wise was delayed a day or so when the ceremony was performed by a Catholic priest in London.

About three days later he sailed with her in the second cabin of a steamer to the United States. He landed in Boston about the 1st of March, 1903, and, being a second cabin passenger, escaped the meshes of the commissioner of immigration and reached his home.

Mr. Chenkooshlian, who had learned the address of complainant's aunt in Hoboken, had written her there of the occurrences in Marseilles and London, and she went to Boston and awaited the arrival of her niece at Charlestown, the Castle Garden of Boston. Not finding her niece among the steerage

passengers, she stated the circumstances to the commissioner of immigration, who immediately procured the attendance of the defendant and complainant at his quarters. The result was that the complainant immediately declared her desire to go with her aunt and continued of that mind for several days while correspondence on the subject was had with the authorities at Washington. The result was that the authorities determined that the complainant should have her choice to go with whom she chose. She chose to go with her aunt and the defendant was prevented by the police from using violence to detain her.

She came to New Jersey with her aunt and her husband followed her, sued out a writ of *habeas corpus* with the necessary result that she was again at liberty to choose between her husband and aunt and again chose the latter.

I mention the occurrences at Boston and in New Jersey to show that after having experienced the joys of married life with her husband for upwards of two weeks, as he says, she was not reconciled to it. I think this outcome most significant of the state of her mind when she went through the ceremony.

The result is that I am of the opinion which I expressed at the hearing that at the time she entered into the marriage she was under the complete physical, mental and moral dominion of the defendant, and that she submitted to that dominion because she thought it was unavoidable, or, as she stated to Mr. Chenkooshlian, because it was her fate.

This leaves to be dealt with the question of consummation.

Defendant swears, and it is not denied by counsel for complainant, that the marriage was consummated. Fortunately there is no issue of that consummation. Undoubtedly a voluntary consummation is usually such a ratification as cures the defect of lack of consent in the original contract. But, then, to have such effect it must be free and voluntary. Here the original constraint and dominion was not removed, but was increased and strengthened by the ceremony itself.

The poor victim had no friend or relative to whom she could turn, but was at the mercy of her husband.

Let us now turn to some of the authorities on this interesting subject.

I shall first refer to *Harford* v. *Morris, 2 Hagg. Cons. 423.* The plaintiff in that case was the natural daughter of Lord Baltimore, upon whom he had settled an estate in trust, one of the trustees being the defendant Morris. While at school, before she was thirteen years old, Morris, having opportunity and authority as her trustee, took her away from school, traveled about England with her, took her to France, went through two or three different ceremonies of marriage with her at different places. The last one being in January, 1773, when she was past thirteen years old. He had sexual intercourse with her after the marriage. The validity of the marriage was attacked on the ground that it was incomplete by the law of the land where celebrated, as well as on the ground of coercion.

Sir George Hay, in the court of arches, declared the marriage valid because she had consented, and there being no actual violence, the defendant having induced her to marry him, as she said, by a threat that he would kill himself. He also said it was valid by the *lex loci.*

An appeal from this decree was taken to the high court of delegates, consisting of three bishops, three temporal lords, three judges of the courts of common law (Justice Willes, Justice Hotham and Baron Eyre), and three judges of the ecclesiastical court, and on the 21st of May, 1784, it reversed the decree of the arches and pronounced the said pretended marriage void, howsoever solemnized. Afterwards, Sir William Wynne, when he had become a judge of the court of arches, and who had argued the cause before the delegates, stated as follows: "The case of *Harford* v. *Morris* was that of the marriage of a girl above the age of legal consent, but taken from school by one of her guardians; it was argued on the law as void by the *lex loci* (foreign country where celebrated). But the judges, during the argument, desired the counsel to consider whether the marriage might not be declared void on *the ground of force and custody.* That point was argued by order of the court, and it is well known that the decision passed ultimately on that principle," viz., force and *custody.*

Another case to which I refer is that of *Portsmouth* v. *Ports-*

*mouth, 1 Hag. 355.* It is valuable because it was decided by Sir John Nicholl, counted a great judge.

The Earl of Portsmouth sued his wife for a declaration of nullity. He was of weak mind and had some eccentricities. He had been married in early youth, with the consent and approval of all his friends, to a woman who had made him an estimable wife and had taken good care of him and his property for many years, until she died. During all that time he had, with her aid and that of his solicitors, transacted all the business of an ordinary man of fortune, and had never been put "in commission."

At the death of his wife he soon became anxious to marry again. I here quote from Sir John Nicholl's opinion: "On the 28th of February, 1814, Coombe (his family physician) thought it prudent to bring him to London, and to deliver him up to his trustees, Hanson being one, and then in town; that day week he was married to the daughter of Mr. Hanson— Hanson, the confidential solicitor of the family, one of the trustees, who had a great ascendency over him; who owed him every possible protection, married him to one of his daughters. It is unnecessary to state the jealousy with which the law looks at all transactions between parties standing in these relations to each other."

Other language of the learned judge is pertinent. In the opening of his opinion, he says:

"The law of the case admits of no controversy, and none has been attempted to be raised upon it. When a fact of marriage has been regularly solemnized, the presumption is in its favor; but then it must be solemnized between parties competent to contract—capable of entering into that most important engagement, the very essence of which is consent—and without soundness of mind there can be no legal consent—none binding in law. Insanity vitiates all acts. Nor am I prepared to doubt but that considerable weakness of mind, circumvented by proportionate fraud, will vitiate the fact of marriage, whether the fraud is practiced on his ward by a party who stands in the relation of guardian, as in the case of *Harford* v. *Morris,* which was decided principally on the ground of fraud, or whether it is

effected by a trustee procuring the solemnization of the marriage of his own daughter with a person of very weak mind, over whom he has acquired a great ascendency. A person incapable, from weakness, of detecting the fraud, and of resisting the ascendency practiced in obtaining his consent to the contract, can hardly be considered as binding himself in point of law by such an act. At all events, the circumstances preceding and attending the marriage itself may materially tend to show the contracting party was of unsound mind, and was so considered and treated by the parties engaged in fraudulently effecting the marriage."

He cohabited with his second wife for several years, and in 1822 she bore a child. His relatives then instituted an inquiry in lunacy, and, after a long litigation, the jury found him insane from a period prior to his marriage. A committee was appointed and the marriage was annulled on the ground that the celebration of the marriage was effected by fraud and circumvention operating upon a man of weak mind.

The two cases just cited are valuable in showing that it is the duty of the court to consider the circumstance that the party complaining of the marriage occupied the position of *cestui que trust* and the party procuring it that of trustee, or that of guardian and ward, and the principle that in such cases the guardian or trustee shall derive no benefit of his position of dominion or superior influence, applies.

Another instructive case is that of *Scott* v. *Sebright, L. R. 12 P. D. 21 (1886)*. In that case the petitioner sought to be relieved of a marriage ceremony entered into by her when she was twenty-two years old. She was a resident of London and possessed of a fortune in her own right, and was induced by the defendant to go through the form of ceremony of marriage with him by threats of the defendant that he would injure her reputation for chastity. The cause was argued by distinguished counsel and received the consideration of Sir Charles Parker Butt, who (at *pp. 23* and *24*) uses this language:

"The courts of law have always refused to recognize as binding contracts to which the consent of either party has been obtained by fraud or duress, *and the validity of a contract of mar-*

*riage must be tested and determined in precisely the same manner as that of any other contract.* True it is that in contracts of marriage there is an interest involved above and beyond that of the immediate parties. Public policy requires that marriages should not be lightly set aside, and there is in some cases the strongest temptation to the parties more immediately interested to act in collusion in obtaining a dissolution of the marriage tie. These reasons necessitate great care and circumspection on the part of the tribunal, but they in nowise alter the principle or the grounds on which this, like any other contract, may be avoided. It has sometimes been said that in order to avoid a contract entered into through fear the fear must be such as would impel a person of ordinary courage and resolution to yield to it. I do not think that is an accurate statement of the law. Whenever, from natural weakness of intellect or from fear—whether reasonably entertained or not—either party is actually in a state of mental incompetence to resist pressure improperly brought to bear, there is no more consent than in the case of a person of stronger intellect and more robust courage yielding to a more serious danger. The difficulty consists, not in any uncertainty of the law on the subject, but in its application to the facts of each individual case."

After reviewing the evidence, he concludes (at *p. 31*) as follows: "On that evidence I have come to a clear conclusion. It is that long before the ceremony was gone through the feelings of this young lady towards the respondent were such that of her free and unconstrained will she never would have married him; that she had been reduced by mental and bodily suffering to a state in which she was incapable of offering resistance to coercion and threats which in her normal condition she would have treated with the contempt she must have felt for the man who made use of them; and that, therefore, there never was any such consent as the law requires for the making of a contract of marriage. Such being the case, I know of no consideration consistent with justice or with common sense which should induce me to hold this marriage binding."

A later case is that of *Ford* v. *Stier, L. R. P. D. 1 (1896)*, before Gorell Barnes, judge. There the petitioner, of the age

of seventeen years, was married to the defendant in the presence and by the procuration of her own mother, but without the knowledge of the rest of her family. There was no consummation. She swore that she thought it was only a betrothal. The reasons given (on p. 5) are the following:

"I have seen the petitioner in the witness-box and am satisfied that she has given her evidence in good faith. Her case is: 'I never intended to marry this man; I thought I was being betrothed to him (certainly it is remarkable that a person of any education should have thought such a thing, but I can only judge by her manner), and I submitted to be betrothed only because my mother and he forced me to do so.' I find that this was so, that she did not consent to marry the respondent, but went through the ceremony as one of betrothal, and in so doing was to such an extent under the influence of her mother and the respondent, that she was not a free agent."

Then we have the case before cited of *Ferlat* v. *Gojon*. There the complainant was nineteen years old, living with her mother and stepfather in the city of New York and earning her living by school teaching, and was decoyed by a priest of her church to his house where she met Mr. Gojon and was induced by him to go with him to a private house where a priest appeared and Gojon then persuaded her to marry him. There was no consummation. The chancellor declared the marriage null because the consent of the complainant at the moment of celebration was feigned and not of her own choice, but caused by fear. He says, "Complainant never consented freely to become the wife of defendant."

He adds: "Marriage is considered by our law as a civil contract, and in this agreement, as in all others, the free consent of the parties is essential to the validity of the contract. Here was no free consent, no voluntary contract, and this fraudulent marriage must be null."

Another famous English case, sometimes termed *"Wakefield's Case"* and sometimes termed *"Miss Turner's Nullity of Marriage Bill"* or simply *"Turner's Case,"* is cited and stated at length by Dr. Bishop. *1 Bish. Mar. & D.* § *512,* and note.

I cite one or two English cases where the decree of annulment has been refused. One is *Fields' Marriage Annulling Bill, 2 H. of L. Cas. 48 (1848–1850)*. In that case Miss Fields brought in a bill in parliament rather than to resort to the ecclesiastical courts, because parliament would hear her evidence in support of her bill, which at that time was not lawful in the ordinary courts. She was an orphan eighteen years old with a considerable fortune and was passing her school vacation with one of the executors of her father's will, whom she considered as her guardian. While there she was courted by his brother, a man old enough to be her father, and finally consented to marry him, and did marry him, without consulting either the executor or the solicitor of her father. Her evidence is given at *pp. 67* and *68*.

The house of lords declined to proceed with the bill because it appeared that she had acted of her own accord and yielded to the ordinary solicitations of a suitor.

Another case is *Cooper v. Crane, L. R. P. D. 369 (1891)*. Petitioner in that case was twenty-four years old and was found by Sir Richard Henn-Collins to have been under no compulsion, subject to no threats and was really willing to live with her husband, but he never followed up the marriage and never sought its consummation, and the real reason of the suit was the desertion by the husband.

The relief was refused.

Dr. Bishop, in treating the subject, subdivides it into three sections—fraud, error and duress. At section 505 he says:

"A single element or an insufficient combination may be rendered adequate by combining with mental weakness short of vitiating insanity, or with immaturity of years, or with anything else of a like tendency, the question in every case being, whether under all the facts the will was overborne, deluded or misled to the extent which will justify a court in declaring the apparent consent a nullity."

At section 506 he says: "The fact is always relevant, if it exists, that when the fraud was practiced the complaining party was of years too immature to be presumably as capable as older persons of resisting its influence," and cites two American cases, *Robertson v. Cole, 12 Tex. 356*, and *Lyndon v. Lyndon, 69 Ill. 43*. At section 514 he cites Fraser, a Scotch writer, as follows:

"Fraud in the constitution of the contract of marriage renders it void. Force implies physical constraint of the will. Fraud some overruling moral necessity, by which a certain state of the will is brought about which could not have been so without deceit. In both cases the result is the same."

He then cites several cases from the Scotch courts and says, at section 521: "These were all cases where the fraud was practiced upon parties who were certainly capable of marriage, but who from their youth were peculiarly liable to be deceived."

I think this language is equally applicable to constructive duress, and Dr. Bishop, at section 538, speaking of duress, says:

"We have seen that in considering fraud in the executed contract of marriage, its special nature, as distinguished from other contracts, must be taken into the account. Now, in natural reason, and it is believed in the law also, duress is different. One impelled by duress to do a thing acts because he must, and his mind is no more free to canvass the nature of the act and perform it or not, according to his view thereof, than to refuse to do it altogether. Hence, we come back to the proposition that the same duress which will avoid an ordinary contract will nullify a marriage."

At section 539, he lays down the proposition:

"When a formal consent in marriage is brought about by force or menace—a yielding of the lips, not of the mind—it is of no legal effect, the same rule being applicable as in ordinary contracts."

He then cites at length the case of *Scott* v. *Sebright, supra,* and quotes with approbation section 541, the language of Judge Butt, above quoted, and at section 542 cites *Harford* v. *Morris, supra,* and the *Turner Case, supra,* as examples.

At section 545 he discusses the question of the effect of consummation and uses this precise and correct language: "When the effect of the fraud, error or duress has been removed from the mind enthralled, the party has the election to affirm or not the marriage. It is affirmed, for example, by a voluntary continuance of the cohabitation with full knowledge of the invalidating facts," and sums up as follows (section 550):

"Where the mind is overcome by fraud, by error or by duress (and ·I shall interpolate all or any two of the three combined), so that in fact it does not consent to an apparent marriage, the law will deem it to be no marriage, though if, after the thrall is broken, it then freely consents, no repetition of the ceremony will be required to make it good. It may be termed void or voidable, according to the meaning which we attach to these uncertain or variable words."

Considering, then, the extreme youth and inexperience of the complainant, although I should be of the same opinion if I believed her to be eighteen years old, her utterly destitute and helpless condition, the absence of any opportunity to have the aid or assistance of any relative, the fact that she felt herself to be in the absolute power of the defendant, who, she was justified in feeling, stood in the position of her parent or guardian, and who, as I believe, took advantage of that position to force her to make an immediate decision and purposely avoided giving her the opportunity to obtain the advice and protection of her aunt, I come to the conclusion that there was no real and actual consent on her part to the ceremony, such as the law requires in order to validate the contract of marriage, and that the subsequent cohabitation with the defendant was submitted to while the same dominating influences were in force without the least abatement, and that such consummation, especially in the absence of offspring, cannot be treated as binding on the complainant.

I will therefore advise a decree of annulment of marriage, with costs, and a counsel fee, to be fixed after hearing counsel, if they desire.