On July 3d 1929, the petitioner filed her petition herein, setting up that she was lawfully joined in the bonds of matrimony to the defendant on February 12th, 1929; that she became acquainted with him a few months before their marriage; that he thereafter sought her company unknown to her parents; that he was assiduous in his attentions, made violent love to her, and she confessed to him a youthful indiscretion committed with some other man; that finally defendant requested petitioner to marry him, and when she refused he then threatened to tell her parents of the youthful indiscretion which she had confessed to him, and he told her that she must marry him immediately, otherwise he would expose her to her parents; that the threats and menaces of defendant so wrought upon the mind of petitioner that she consented under the duress and fraud of defendant, as aforesaid; that defendant represented himself to her as *Page 316 
a man of good moral character, whereas, after said marriage, petitioner learned that the character of defendant was not good, and, in fact, it was dissolute and immoral, and further learned that he had been living as man and wife with other married women almost to the time they went through their ceremony of marriage; that petitioner at that time made false answers to the questions of the officiating magistrate as to her age, and did give formal consent to the marriage with defendant under the fear, threats and menaces of defendant, as aforesaid; that petitioner and defendant separated immediately after the marriage, she going to the home of her parents, but finally, upon the fear and threats of exposure, and coercion by defendant, consented to live with him as his wife; that petitioner, upon assuming cohabitation with the defendant, was in constant fear and coercion of the threats by him to expose her to her parents and was rendered so miserable, nervous and debilitated that after a period of three weeks she left the defendant and has not since cohabited with him, and that the marriage between petitioner and defendant has not been consummated with bodily knowledge. Such are the allegations in her petition. And they fall short of being proved; in fact, the proof in every essential particular, is quite the other way, as will hereafter appear, by proper construction, at least. The petitioner goes on further to allege the residence of both parties in this state, and prays that the pretended marriage between them may be declared null and void for the causes aforesaid, and that she may have other and further relief.
The master in his report found that petitioner, a girl of apparent refinement, brought up in a refined home and a fashionable private school, at the age of nineteen met the defendant, and at their second or third meeting, and in the home of a young married couple, a conversation was entered into discussing previous experiences. Petitioner (indiscreetly, though apparently quite innocently) mentioned the fact that at the age of fifteen she had had an experience, in other words, had been taken advantage of by a young man much older than herself, and that she would rather die *Page 317 
than have her parents learn of this (the clear inference being that she was sexually embraced on that occasion). A short time thereafter petitioner was invited by defendant to go on a ride with him and the mentioned married couple, for one day, and when in Greenwich, Connecticut, the place of the marriage, defendant informed petitioner that she must marry him on that day or he would tell her parents of the experience suffered by her at the age of fifteen. According to petitioner's testimony, through fear that defendant would tell her parents she entered into the ceremony while terribly upset, crying and not knowing what it was all about. Immediately upon the performance of the ceremony petitioner returned to the home of her parents and defendant returned to his mother's home. From the date of the marriage to May 1st, 1929, defendant threatened petitioner that he would tell her parents of the incident in question unless she cohabited with him, and on the date last mentioned, to prevent the carrying out of said threat, she informed her parents that she was married, and went to live with defendant at the home of his mother.
Now, be it remembered that the parties were married on February 12th, and this was on May 1st. She was with her parents upwards of two months after relating her remarkable experience, and should have told them what she had stated voluntarily to three persons — comparative strangers. How could she expect the secret to be kept? It probably had been retailed to some person or persons by that time. It was her duty to confide in her parents and seek their protection from this asserted libertine, instead of flying to his arms.
Petitioner says that she was treated so cruelly at the house of defendant's mother that she could not endure living with him, even though he daily threatened to inform her parents of the incident mentioned, if she should leave him. On or about May 20th, 1929, she did leave him, and defendant the next day informed her father. She was willing at last that the exposure should take place rather than to live longer with him to suppress it; and this emphasizes the fact that she *Page 318 
should have informed her parents in the first place, and sought their protection then, instead of waiting.
The master reported that the consent of the petitioner to enter into the ceremony of marriage, and later to enter into matrimonial relations with him, was extorted by duress; that the element of consent to the making of the matrimonial contract was lacking, and that the duress under which the invalid contract was made was still operative at the time and all through the subsequent cohabitation. He also further reported that he found that the case was clearly controlled by Avakian v. Avakian,69 N.J. Eq. 89; affirmed, Ibid. 834, and by the principles set forth therein; and that the facts are on a par with those set forth in Scott v. Sebright, discussed in the Avakian Case atp. 108; that the facts of the present case also fell within the rule expressed in Biddle's N.J. Div. Prac. (2d ed.) at p.44, that "where the act of consent is voluntary, and the intent contractual, but * * * it springs from a choice of evils, so that in order to escape what the party dislikes most, he does that which he dislikes less." The citation from Biddle says that the language is that of Sir James Fitzjames Stephen, but does not cite the case in which he used it. And the master recommends a decree of nullity for the cause of duress under the general equity jurisdiction of this court.
In my judgment, the Avakian Case does not apply. It was there held by Vice-Chancellor Pitney that the evidence showed that a marriage contract between an Armenian girl fourteen years of age and another Armenian fifty-five years of age, and devoid of physical or other attractions, solemnized in a strange country, where the girl was without friends or money, was procured through duress of the man practised on the girl, who was entrusted by her father to his care to bring her to the United States, but who, in England, compelled her to marry him. She was immature and entirely within his control — a stranger in a strange land. The case of Sebright may seem to be an authority for annulling this marriage, but the doctrine of duress as established in this state does not embrace the case sub judice. *Page 319 
This young woman was nineteen years old at the time of her marriage, and she ratified it, even if it were voidable, by going to live with defendant. She says it was by reason of like threats and coercion, but this I am not prepared to believe.
In Capasso v. Colonna, 95 N.J. Eq. 35, I said, at p. 38:
"Duress is defined to be that degree of constraint or danger either actually inflicted or threatened and impending, which is sufficient in severity or in apprehension to overcome the mind of a person of ordinary firmness. 13 Corp. Jur. 296 § 110. This definition was approvingly cited by the court of errors and appeals in Byron v. Byron, Heffernan Co., 119 Atl. Rep. 12.
And the agreement must have been entered into because of the fear of the threatened injury, otherwise there is no duress which will ordinarily invalidate a contract entered into after opportunity for deliberate action. 13 Corp. Jur., supra. Surely this young woman had time for reflection. She had time over night, and instead of going to New York in the morning to marry the defendant she should have informed her brother so that he might have had the defendant arrested and bound over to keep the peace." And this case was affirmed, 96 N.J. Eq. 385.
Another thing: The defendant called the petitioner on the telephone and asked her to take a ride with him. She did so in the car of the Armstrongs, the married couple to whom, along with the defendant, she had formerly related her misadventure; and they too were on the ride. She says: "We were sitting in the back of the automobile and he said, `Let's get married,' to which she replied: `Positively not, I never heard of such a thing.' Whereupon he said: `Well, think this over, and if you don't marry me to-day I am going to tell your family everything I know about you.'" She says the Armstrongs did not hear this; that they then went into a building and were married. She disingenuously fails to state whether the Armstrongs went in also, and fails to tell why she did not appeal to them for protection instead of meekly submitting to this man's threats, assuming they were made. And more significant still is the fact that these Armstrongs *Page 320 
were not called as witnesses. It looks as though the petitioner were endeavoring to impose a case upon the court.
Vice-Chancellor Stevenson, in Cox v. Cox, reported inBiddle's N.J. Div. Prac. (2d. ed.) 362, says that the complainant was beset by the mother of the defendant, the defendant himself and his sister, to forthwith marry the defendant without communicating with her parents. The girl was seventeen years of age and the mother of the defendant stood inloco parentis to her. The marriage was unconsummated, and the learned vice-chancellor further said that an unconsummated marriage which is infected by fraud of any kind whatsoever which would render a contract voidable, is voidable at the option of the injured party, if promptly disaffirmed before any change of status has occurred. This principle the learned vice-chancellor again affirms in the later case of Ysern v. Horter, 91 N.J. Eq. 189.
And it has been cited approvingly in several cases since. The case at bar is not an unconsummated one; so the doctrine of the Coxe and Ysern cases does not apply.
Speaking of duress under which to avoid a contract, the court of errors and appeals, in Koewing v. West Orange,89 N.J. Law 539, said that duress for which a person may avoid a contract * * * exists where one by unlawful act * * *, or the act of some person with his knowledge, is constrained under circumstances which deprive him of the exercise of free will, to agree to or to perform the act sought to be avoided. Now, there is at least nothing shown in the instant case that this young woman did not have an opportunity to avoid this marriage if she so desired. By her own testimony she was out riding not only with the defendant, but with a married couple, all being in the automobile in the place where the marriage occurred, but whom she fails to state were at her marriage, or absent from it, when she perfectly well knew whether they were or were not; and, besides, she failed to call them as witnesses. It must be perfectly obvious that she could have relied upon their assistance to have avoided this marriage, if their assistance were necessary. Another thing: She answered the defendant pertly enough when he suggested *Page 321 
the marriage while on that ride in the automobile, where all the parties were present. When he made the proposition to her, instead of protesting in fright and calling upon her friends for assistance, she remarked: "Positively not, I never heard of such a thing." She appeared to have her mind with her then, she was with friends who could have assisted her, and yet she consented to the marriage ceremony, apparently without calling upon them, and went through with it. To say that she was coerced into doing it, or that it was the result of duress, is to me absurd. Another thing: While she naively alleges in her petition that the marriage was never consummated by bodily knowledge, she does not swear to it. It is impossible to believe that there was no bodily knowledge during the twenty days she lived with defendant.
There may be extreme cruelty present in this case, but this is not an application to dissolve the marriage for that cause under the act of 1923, P.L. p. 494; nor is it a petition for a divorce from bed and board, Rudin v. Rudin, 104 N.J. Eq. 524;
but is one for annulment of marriage, and the cruelty cannot operate to annul it for fraud that affected the contract itself, because that occurred during the three weeks the parties cohabited together after the ceremony. She went to live with defendant and stayed with him three weeks. She never testified that she had not submitted to his sexual embraces, and the master properly reported that they lived together as husband and wife, the meaning of which is obvious. Nor is there any testimony that defendant represented himself to be a man of good moral character, nor proof that he had lived with married women as husband almost up to the time of the ceremony with petitioner, so that, as an element of fraud affecting the marriage relation, it does not enter into the contract.
The result reached is: That duress was not present, that the marriage of the parties was legal and binding, that the master's report should be overruled, and the petition dismissed. *Page 322